**INTERTRIBAL MONITORING ASSOCIATION on Indian Trust Funds**
Phone: 505/247-1447   Fax: 505/247-1449   Email: itma@itmatrustfunds.org

May 7, 2007

# ITMA BRIEFING PAPER
## ITMA TRIBAL TRUST FUND SETTLEMENT PROJECT

**ITMA Tribal Meeting**
**Denver, Colorado**

Objectives of TTFSP

The two principal objectives of the TTFSP are to:

- Provide tribes with a methodology for reaching settlement of historic tribal trust fund balances without resort to litigation
- Permit tribes and the government with a common basis on which to resolve broader issues, thus permitting at long last an honorable resolution of tribal claims, and government compliance with the 1994 Indian Trust Funds Management Reform Act.

The actual TTFSP is designed to address specifically cash management issues, including cash that *should* have been collected, for the period of fiscal years 1972-1992.

Background

In the 1990's the government retained Arthur Andersen LLP ("AA") to prepare historic reports on tribal trust fund accounts for each tribe that had trust fund accounts open during the years 1972-1992. The final product from the AA work was reported upon in an AA Agreed Upon Procedures Report and therefore could not and did not include any AA opinions about the results of the basic reconciliation and other work performed. Consequently, the AA work did not generate historical account statements that were represented by AA as reconciled or accurate.

Nonetheless, the government has suggested that the AA reports constituted a sufficient "accounting" to start the statute of limitations running on any claims that tribes might have had for losses through mismanagement of those funds. Additionally, the government has suggested in draft regulations that the balances reflected in those reports might be "deemed" complete and accurate by federal regulation. And, finally, the government has proposed using the AA work as a starting point for seeking

settlement of trust funds claims asserted in litigation by tribes who have filed suit against the government.

For their part, tribes have insisted throughout that the AA reports do not constitute an "accounting" for any purpose, not to start the running of the statute of limitations, not for purposes of establishing accurate account balances, and certainly not for purposes of putting the government into compliance with the Indian Trust Funds Management Reform Act of 1994.

This has left unresolved the account balances of all tribes, notwithstanding the more than $20 million the government spent on the Arthur Andersen contract. Some tribes who have sued the government have, in fact, made use of the AA work for the purpose of reaching settlement with the government on claims arising from the administration of Indian trust funds. Some of those settlements have been restricted to fiscal claims relating solely to fund management, and some settlements have resolved much broader claims that the tribes might have chosen, instead, to litigate more fully.

ITMA has always taken the view that a good many tribes would have neither the resources nor enough at stake to permit litigation of their trust fund claims. All tribes, however, do have an equal right to be treated fairly and honorably in satisfaction of their claims arising from the administration of their trust funds. Primarily for the benefit of those tribes who for whatever reason might choose not to litigate their claims, and to avoid the "default" result that those tribes would be stuck with the results indicated by the Arthur Andersen reports prepared without any tribal input whatsoever, ITMA has for years encouraged the government to engage in a process for permitting tribes to reach a mutually acceptable resolution of their account balances through a participatory process.

This effort failed during the Clinton Administration because the government was unwilling to concede that there were any systemic failures in the historic administration of tribal trust funds that would permit the application of a methodology to individual tribes' accounts for purposes of calculating amounts due. Early in the Bush (George W.) administration, the government contracted with the National Congress of American Indians to convene a "task force" of government and tribal leaders in an effort to reach a much more broad-based trust fund settlement and trust reform agreement. That effort ultimately failed. The government then approached ITMA with the suggestion that a cooperative agreement might produce a methodology sufficiently acceptable to both the government and to tribes that it could be applied to reach settlement of tribal trust account balances.

ITMA agreed to participate so long as basic principles were not sacrificed in the process. ITMA insisted that each participating tribe would retain its sovereign prerogatives to enter or leave the process at any time; that participation did not subject any tribe to an obligation either to accept or to employ the methodology developed; and that the methodology developed must permit each tribe to examine the Arthur Andersen work performed for its own accounts; and that the methodology developed must permit

each tribe to deal with the government on an individual tribal basis, *i.e.,* the process would not result in any proposal for a "global" settlement. After lengthy negotiations, these basic principles were agreed to, and a cooperative enterprise ensued between ITMA and the government.

Seven tribes agreed to participate in Phase I of the project, which involves only the development of the methodology. Those tribes are Colville, Yakama, Fort Belknap, Sac and Fox, Picuris, Nez Perce, and Coeur d'Alene (the "Participating Tribes").

Description of TTFS Project:

The TTFSP attempts to reach settlement on trust fund balances for the period covering fiscal years 1972-1992, the period covered by the AA work. Both ITMA and the government contemplate that agreement on tribes' fiscal claims for this period should permit even broader agreement and settlement, based on mutually agreed conclusions reached on the basis of a rigorous and disciplined review of empirical data from the AA period. The following is a general description of the proposed methodology based on the Phase I work performed to date.

*Review of AA work*

The TTFSP takes as a starting point the work performed by AA for the years 1972-1992. The government wants to get as much value as can be derived from the extensive account review work that AA did. ITMA and the Participating Tribes want to be comfortable that what AA did *not* do receives as much attention as those issues deserve. To begin, then, the government provided each Participating Tribe with its own AA report and supporting documents in electronic format. Using this information the Participating Tribes have developed certain suggested steps that should be taken by any Phase II Tribes participating in settlement negotiations using an agreed upon Phase I methodology.

The government will provide each Phase II tribe with its own AA report and supporting documents in electronic format. Then, with ITMA and expert consultant advice if desired, the tribe can ask for additional information regarding issues that AA did not review, such as tribal accounts maintained in the IIM portfolio, etc.

Each tribe will be provided an opportunity to review the work performed by AA on its own accounts. This review is designed to develop a confidence level that AA did actually perform the work it claimed to do, and that the reports issued do fairly reflect the results of that work. This review includes an opportunity to check the amounts posted as receipts against the underlying documents reflecting the amount actually due under leases, range permits, timber sale contracts, mineral leases, rights-of-way agreements, etc. This methodology does not contemplate a transaction-by-transaction review, but a testing of the AA work on the basis of judgment samples selected by the tribes themselves.

*Review for completeness*

The TTFSP will permit each tribe to review the AA work against its own records or other extrinsic information to determine whether sources of receipts were somehow excluded or omitted from the AA work. In other words, since the AA work examined receipts actually posted to the accounts, there remains the possibility that receipts that should have been received were for some reason not posted. For instance, many tribes had significant amounts received into IMPL, tribal IIM, or Special Deposit Accounts that were not reviewed by AA. This review permits tribes to achieve a level of confidence that all sources of revenue have been examined. This stage also permits both the tribes and the government to achieve an agreed-upon baseline of the universe of transactions against which to apply any subsequent sampling or stratification techniques.

*Disbursements*

The AA work attempted to reconcile each non-investment disbursement from tribal trust fund accounts against underlying documents authorizing and justifying the disbursement. Most disbursements could not be fully reconciled according to the criteria originally established for a variety of reasons primarily relating to the inability to locate all the underlying documents sought. This phase of the TTFSP permits each tribe to examine selected non-investment disbursement transactions to determine for itself whether to challenge any of the posted disbursements.

*Investment analysis*

The AA work did not examine investment transactions but, instead, reported on the investment performance achieved for each tribe against "benchmark rates" established for the performance achieved for all tribes in each of the years reviewed. This procedure would identify significant anomalies in any one tribe's investment earnings as compared to other tribes' earnings for the same period. It would not, however, indicate anything about the government's investment performance as measured by any objective standard. If all tribes were treated in the same manner, for instance, in reducing trust accounts when a Treasury check was requested as opposed to when the Treasury check was actually negotiated (disbursement float), then the benchmark review would not reveal any anomaly in any individual tribe's earnings. Many tribes experienced significant "deposit lag" times as well, between the time of receipt and deposit of funds into tribal trust accounts.

The TTFSP methodology contemplates that each tribe, once it has completed a review of the AA work and its completeness review, would be permitted the expert services of an investment professional to advise on what the government *should have* been able to achieve considering the amounts available for investment, liquidity needs, and other factors bearing upon investment decisions.

*Contemplated result of TTFSP methodology*

The TTFSP is designed to permit each tribe to develop a level of confidence that, for the period reviewed by AA, monies due to the accounts were either posted or identified in the TTFSP review; that disbursements made from the accounts were either justified or identified for challenge; and that amounts that should have been earned on remaining funds were calculated under applicable trust standards. The resulting balances can then be compared to the actual balances identified in the AA reports, and differences resolved by settlement negotiations. The resulting formula for application of the contemplated TTFSP methodology can be succinctly stated as:

[Money-in minus Money-out x what should have been earned (rate of return)] minus actual earnings recorded = claim

Current (March 2007) Status of TTFSP development

As of early March 2007, negotiations to agree on the substance of the methodology have been quite arduous between the Participating Tribes and the Department of the Interior. Agreement on the basic concept and elements of the methodology seems within reach, but considerable difficulty still attends agreement on the details. Part of the difficulty stems from the government's continued desire to have a methodology that will permit application on a broad scale, and ITMA's continued insistence that the methodology will be acceptable only insofar as it permits tribes to apply it to their own accounts in a manner that fits with their own experience and knowledge of local circumstances. These differences are being narrowed with each meeting, however, and both ITMA and the government have agreed to pilot a significant element of the methodology by actually applying it to the accounts of one of the Participating Tribes before finalizing Phase I.